**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ARLINGTON INDUSTRIES, INC.,

    Plaintiff,

        v.

BRIDGEPORT FITTINGS, INC.,

    Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are three motions *in limine* (Docs. 98, 100, & 104) pertaining to the scope of allowable evidence at the upcoming hearing on Plaintiff's Motion for Contempt, currently scheduled for October 25 & 26, 2012.  This contempt motion is in regard to a January 18, 2012 confession of judgment in a continuing patent infringement dispute between Plaintiff Arlington Industries, Inc. and Defendant Bridgeport Fittings, Inc.  For the reasons set out below, both parties' motions *in limine* will be granted in part and denied in part.

## BACKGROUND

This action has a fairly elaborate history,[1] but the pertinent facts to the instant motion are relatively simple.

Arlington and Bridgeport both manufacture electrical conduit fittings which are used to connect electrical wiring and cable.  Previously, connecting a cable into an electrical

---

[1] A more elaborate history of the litigation between these parties can be found at *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 497 (M.D. Pa. 2010).

junction box required a threaded lock nut which was unwieldily and inconvenient.  In 1992, Arlington developed a connector that could simply be snapped into the junction box.  Tools, however, were still required to secure the incoming cable to the connector, but Arlington eliminated this problem in 1998 with a patented connector that allowed a cable to be snapped into the connector, which together could then be snapped into the junction box.  In 1999, Bridgeport released a similar product line of quick-connect fittings.

On March 19, 2001, Arlington brought an action in this district, No. 3:01-cv-0485 ("the '0485 Action"), for infringement of U.S. Patents Nos. 5,266,050 ("'050 Patent") and 5,171,164 ("'164 Patent") against Bridgeport Fittings, Inc.'s ("Bridgeport") entire line of Snap-In connectors.  That action was assigned to the Honorable Judge Christopher C. Conner. Shortly thereafter, on January 28, 2002, Arlington filed the instant action for infringement of United States Patent No. 6,335,488 (the "'488 Patent") against a subset of Bridgeport's products accused in the '0485 Action, namely the 590-DCS and 590-DCSI Speed-Snap connectors (the "Enjoined Connecters"), which was assigned to me.  Although the '0485 action proceeded further than the instant action, both were settled as part of an April 17, 2004 settlement agreement.

Following settlement, Bridgeport released a new line of connectors which Arlington found similarly infringing including the connectors currently at issue in this case: the Whipper-Snap 380SP and 38ASP connectors (the "Accused Connectors").  Judge Conner then reopened the '0485 Action and entered a confession of judgment on June 30, 2006. A jury subsequently found that 29 of those new products literally infringed the '050 Patent, that one infringed under the doctrine of equivalents, and that 26 of them were colorable imitations.  *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 497

(M.D. Pa. 2010).   Judge Conner entered a permanent injunction, which expired on December 4, 2011 along with the '050 Patent.  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, CIVA 3:01-CV-0485, 2010 WL 817519, at *8 (M.D. Pa. Mar. 9, 2010).

With the expiration of the '050 Patent, Arlington returned its attention to the instant matter which had been dormant for almost eight years.[2]  It informed Bridgeport that–while it was liberated to sell some of the products previously enjoined by the '050 Patent–that the two Accused Connectors were infringing on the '488 Patent (which remains valid until 2018).  Bridgeport nevertheless began selling the Accused Connectors, and, on January 18, 2012, Arlington filed an Unopposed Motion to Enter Defendant's Confession of Judgment and Injunction.  (Doc. 44.)  This motion was granted, the matter was reopened, and the Clerk of Court was directed to enter the Confession of Judgment and Injunction.  (Doc. 46.)  That Confession of Judgment merely provided "that Claim 1 of United States Patent No. 6,335488, which is not invalid and not unenforceable, is infringed by the manufacture, sale and offer of sale of the following Bridgeport's Speed-Snap™ products with external and internal spring steel rings: 590-DCS and 590 DCSI."  (Confession at ¶ 1, Doc. 47.)

In order to prohibit the sale of the Accused Connectors, on February 13, 2012, Arlington filed a motion for contempt for violating the above Confession of Judgment.  (Doc. 51.)  In particular, Arlington moves the Court to hold Bridgeport in contempt for violating the injunction through the sale of the Accused Connectors, to issue an injunction on the Accused Connectors, and to award Arlington two times its lost profits as well as attorney fees.

---

[2]The Court entered an order on April 23, 2004 stating that the action would be dismissed without prejudice and that the Court would maintain continuing jurisdiction in order to enforce the terms of the Settlement Agreement between the parties.  (Doc. 42.)

While the motion for contempt is scheduled for hearing in October, the parties have each filed motions *in limine* to narrow the evidence that will be presented to the Court at that hearing.  These three pending motions *in limine* are explored below.

## DISCUSSION

### I.    Legal Standard

"[T]he party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes."  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011).  In particular:

> **The analysis must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product . . . but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product.**  Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims.  Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant.  If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant.  Contempt is then inappropriate.

*Id.* (citation omitted, emphasis added).  Thus, "[t]he primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises 'a fair ground of doubt as to the wrongfulness of the defendant's conduct.'"  *Id.* (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

4

II.     **Plaintiff Arlington Industries, Inc.'s Motion *in Limine* to Exclude Bridgeport's Arguments and Evidence Concerning Unmodified Features of the Accused Products and Bridgeport's Waived Defenses (Doc. 100)**

In this motion *in limine*, Arlington seeks to preclude Bridgeport from "re-litigat[ing] the legal and factual basis for the original controversy between the parties despite its admission of infringement and the entry of judgment of infringement by this Court." (Pl.'s Br. at 4,  Doc. 101.)  As noted, the earlier Confession of Judgment states only that the '488 Patent "is infringed by the manufacture, sale and offer of sale" of the Accused Connectors.  (Doc. 47.)

A.      **Unmodified Features are Irrelevant**

Claim 1 of the '488 Patent contains seven specific limitations.  The purported differences between the Enjoined and Accused Connectors do not impact five of these seven limitations.[3]  Yet, Bridgeport seeks to raise non-infringement defenses to the five unaffected limitations.  Arlington argues that this is contrary to settled law, and that allowing Bridgeport to argue as such would be a waste of judicial resources.

As explained, "[u]nder *TiVo*, contempt requires proof that (1) the newly accused product is no more than colorably different from the previously adjudged infringing product, and (2) the newly accused product actually infringes the asserted patent." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012).  Thus, the analysis first looks to "the differences between the features relied upon to establish infringement and the modified features of the newly accused products."[4]  *TiVo*, 646 F.3d at 882.  If such differences are

_____

[3] Specifically, Bridgeport's modifications pertain only to the leading end, which only implicates limitations 2 and 3 of the seven limitations in Claim 1.  Thus, Arlington seeks to fully preclude arguments and evidence as to limitations 4-7 and 1.

[4] There is no explicit guidance on how to apply *TiVo* to the instant case, a negotiated settlement where there has not been a judicial finding of infringement, but an *admission* of infringement.  However, to analogize, in *Merial*, the Court of Appeals for the Federal Circuit addressed a similar situation where the appellants

merely colorable, "the court is required to evaluate the modified elements of the newly accused product" to ensure that the accused product actually infringes. *Id.* at 883.

Bridgeport is not entitled to raise arguments pertaining to unmodified features of the Accused Connectors. A contempt hearing must be limited to only the alterations between the infringing and modified products because a finding of infringement "necessarily and conclusively establishe[s] that [Plaintiff] met each limitation recited in the asserted claims of the . . . patent." *Merial*, 681 F.3d at 1300. Opening the analysis to such unchanged features would amount to a collateral attack of the underlying matter, which is impermissible as "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *TiVo*, 646 F.3d at 889 (quoting *Maggio v. Zeitz*, 333 U.S. 56 at 69 (1948)); *Merial*, 681 F.3d at 1300 ("infringement by an originally accused product are generally not open to challenge in contempt proceedings."). It would not make sense to allow a party to admit patent infringement, to make subsequent changes to some aspects of the admittedly infringing product, and to then argue that the unchanged components were never proven to infringe and are still at issue. Therefore, Bridgeport will be precluded from presenting arguments of

---

argued that "the district court could not competently evaluate whether colorable differences exist between [the products] because the default judgment allegedly offered no guidance on which specific features . . . were focused on to establish infringement." 681 F.3d 1283, 1300 (Fed. Cir. 2012). That Court first noted that such "judgment is no less binding or authoritative simply because comprehensive and painstaking factual analyses regarding every claim limitation may have been unnecessary or impractical at the time of the initial decision." *Id.* It then explained that, "whether or not the default order . . . included an exhaustive infringement analysis, it necessarily and conclusively established that [the Plaintiff] met each limitation recited in the asserted claims of the . . . patent." *Id.* Specifically, the district court found that while the default judgment identified the chemical composition of the enjoined product–the first limitation of that claim–the remaining two limitations of that claim were admitted "by virtue of default." *Merial Ltd. v. Cipla Ltd.*, 3:07-CV-125 CDL, 2011 WL 2489753, at *6 (M.D. Ga. June 21, 2011). Resolving from those specific limitations, the district court was found to have had an "ample basis" to conclude that the new product was "not more than colorably different." *Merial*, 681 F.3d at 1301.

non-infringement pertaining to any limitation unaffected by the redesign of its connectors.

Applying this principle, Arlington specifically avers that Bridgeport should be precluded from raising non-infringement arguments as to limitations four through seven and one in Claim 1, which sets out the following:

A method for attaching an armored or metal clad electrical cable to a junction box comprising:

(1)     providing a junction box having an aperture;

(2)     providing a member having a leading end with an external cylindrical surface and a trailing end with an inner diameter;

(3)     providing a spring steel adapter surrounding said leading end external cylindrical surface for snap fitting into said aperture;

(4)     providing a spring steel loading rind inserted into said trailing end inner diameter;

(5)     restricting rearward withdraw motion of said spring steel locking ring from said member;

(6)     receiving and armored or metal clad cable in said steel locking ring; and

(7)     preventing removal of said armored or metal cable in a rearward direction from said spring steel locking ring.

U.S. Patent No. 6,335,488 col.9 l. 27 - col. 10 l. 12 (issued Jan. 1, 2002).

Bridgeport articulates only four core changes between the Accused and Enjoined Connectors: (1) the lack of a "lip" on the Accused Connectors; (2) the lack of a cylindrical surface on the Accused Connectors; (3) the lack of a smooth surface on the leading end of the Accused Connectors; and (4) the lack of an adaptor "surrounding" of the leading end surface.  Since these changes only potentially implicate limitations two and three, they are the only limitations that will be at issue in the upcoming contempt hearing.

7

**B.    Importing Earlier Claim Constructions**

Before settlement, Arlington served Bridgeport with an expert report "detailing how Bridgeport's use of the specific features of the Enjoined Connectors satisfied each limitation of Claim 1 as construed by Dr. McDonald."  (Pl.'s Br. at 6, Doc. 101.)  Although Bridgeport contested these allegations and submitted rebuttal reports, it settled with Arlington three months later.   From this, Arlington argues that Bridgeport waived its right to claim construction as to the motion for contempt when it admitted infringement and submitted to the entry of judgment.

Arlington correctly represents that *TiVo* binds the Court to "any prior claim construction that it had performed in the case."  *TiVo*, 646 F.3d at 883.  And, in *Merial*, the Federal Circuit opined that, following default judgment, "the judgment is no less binding or authoritative simply because comprehensive and painstaking factual analyses regarding every claim limitation may have been unnecessary or impractical at the time of the initial decision."  *Merial*, 681 F.3d at 1300.

Here, there is no contention that the earlier entry of judgment is not binding. However, because the underlying dispute was settled, and it was decreed that the Enjoined Connectors infringed, it does not necessarily follow that the Enjoined Connectors were infringing in exactly the manner described in Arlington's proffered claim constructions.

The purpose of this admission of infringement, as opposed to Bridgeport merely agreeing to remove the products from the marketplace, was presumably to preclude Bridgeport from returning to the market with a revised product containing only superficial modifications.  While this restriction was a basis of the bargain, that agreement did not go on to define what it was about the Enjoined Connectors that was exactly infringing.  In other

words, the benefit of this admission of infringement was that Arlington could come back to this Court and initiate a contempt hearing without having to open a whole new patent suit. Yet, while envisioning this eventuality, neither party incorporated into the settlement the exact parameters of the infringement.  These are highly sophisticated parties, and it would be inappropriate to read into this agreement elements that are not there.  Therefore, I will decline to incorporate Arlington's earlier claim constructions into the instant motion for contempt.

Of course, this does not mean that Bridgeport can propose any claim construction it desires.  As Bridgeport has admitted that the Enjoined Connectors were infringing, any claim construction at the contempt hearing must be faithful to this admission.  As noted, and as admitted by Bridgeport at the oral argument on these motions, this finding of infringement establishes that the Enjoined Connector met each limitation in the '488 Patent.  *See Merial,* 681 F.3d at 1300 (approving a district court's finding that, through default judgment, the defendant had admitted infringement as to each limitation of the claim).  Thus, any claim construction in this matter must reflect this and will need to be crafted in such a way that the Enjoined Connector would be found to be infringing as to each limitation under the construed terms.[5]

### III.    Plaintiff Arlington Industries, Inc.'s Motion *in Limine* to Exclude Bridgeport's Arguments and Evidence Concerning Randomly Chosen Features (Doc. 98)

Arlington believes that there exists only a single genuine dispute between the parties: whether Bridgeport's modification from a connector with a stepped, cylindrical shape to a

---

[5]As Arlington noted at oral argument in regard to *Merial*, a subsequent motion for contempt in such a procedural posture requires looking at the patent, the enjoined product, and the accused product to derive a comprehensive claim construction.

sloped, conical shape is merely colorable.

Arlington argues that Bridgeport's three other purported modifications are "randomly chosen features"[6] not required by Claim 1, and are therefore irrelevant.  Specifically, *TiVo* held that the primary stage of the contempt analysis should not dwell "on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product . . . but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product."  *TiVo*, 646 F.3d at 882.

Specifically, Arlington seeks to preclude as randomly chosen features: (1) the lack of a "lip" on the accused connectors; (2) that the leading edge of the accused connector is not smooth; and (3) that the adaptor on the accused connectors does not completely encircle the leading end.  These factors will be considered below *in seriatim*.

### A.    Lack of a Lip

Arlington contends that the lack of a lip on the Accused Connector is a random modification that is not entitled to consideration at the upcoming contempt hearing.

Arlington correctly notes that Claim 1 of the '488 Patent does not explicitly mention such a lip feature.  Instead, Claim 1 provides for "a member having a leading end with an external cylindrical surface and a trailing end with an inner diameter."  Bridgeport's own expert agreed with this construction, opining that Arlington would not need to prove the existence of a lip in order to show that an accused connector was infringing.  (Williamson Dep., 121:18; Doc. 102-1.)  Bridgeport instead relies on the "Description of the Invention" in

---

[6]"Randomly chosen feature" appears to be an evolving term of art.  *TiVo* is the only case within the Federal Circuit that includes the term, and the district courts have only used the term when quoting *TiVo*.

the patent which mentions that "[a] lip prevents adapter from slipping out once inserted." U.S. Patent No. 6,335,488 col.4 ll.17-18 (filed Jan. 1, 2002).  This lip is also referenced in other places in the Description.  (*See Id.* at col.7 ll.34-37 ("A lip is located at the forward end of the die cast member and the lip and central flange define the boundaries of reduced diameter seat.").)  And, Figure 6 of the Patent also visually shows a lip.

The terms within the description of the invention are not dispositive of the limitations. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (noting "repeated statements that limitations from the specification are not to be read into the claims"); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.").  Further, in *TiVo*, the Federal Circuit was clear that, in a contempt analysis, a district court is confined to the terms within the claim's limitations, specifically those "elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy *specific limitations of the asserted claims*."  646 F.3d at 882 (emphasis added).  While it is argued that Arlington never proved *per se* infringement of the specific limitations, there is no indication that even if this were true, that a court could then go behind the limitations.

Courts do sometimes consider these specifications.  For example, in *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005), the Federal Circuit relied on language from the description of the invention to conclude that a method patent claim for razors with "a group of first, second, and third blades" could also apply to a razor with four blades.  The description specifically stated that the invention related "to safety razors having blade units with a plurality of blades."  *Id.* at 1373 (emphasis omitted).  Relying on this

11

supportive language, that court rejected the description's references to a "preferred embodiment of the invention with three blades" as an impermissibly imported limitation. *Id.* at 1371. Thus, while specifications in the description of an invention may be used to extend a claim, they should not be used to limit a patent's purview. *See e.g. Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1327 (Fed. Cir. 2003) (declining "to import a limitation from the preferred embodiments to restrict the meaning of a claim term" as the Federal Circuit has "consistently warned against this approach to claim construction, which is seldom justified.").

Therefore, because Claim 1 does not require a lip, it is a randomly chosen feature and Arlington's motion will be granted insofar as Bridgeport will be precluded from relying on this feature as a difference between the Accused and Enjoined Connectors.

### B.   Smooth Surface

While Bridgeport represents that the lugs of the Accused Connector prohibit a smooth surface, Arlington responds that this apparent lack of a smooth surface on the Accused Connectors is also a randomly chosen feature which is irrelevant to the *TiVo* analysis.

In support of its position, Bridgeport points to the "Summary of the Invention" which notes "a die cast member including at the inbound end a smooth outer cylindrical section," '488 Patent col.2 ll.39-40, and the "Description of the Invention" which similarly references "a die cast member having a smooth outer cylindrical section," *Id.* at 9:4-5. However, as above, Arlington correctly notes that Claim 1 does not specifically require a smooth surface. Arlington also argues that the instant patent, in incorporating the '106 patent with a threaded tip, explicitly envisioned a non-smooth connector.

Therefore, for the same reason as above, because Claim 1 does not require a smooth

surface, Arlington's motion will be additionally granted insofar as a smooth surface is a randomly chosen feature irrelevant to step one of the *TiVo* analysis.

### C.    Steel Adaptor Surrounding the Leading Edge

#### 1.    As a Randomly Chosen Feature

Arlington similarly argues that the Accused Connectors' lack of an adapter fully surrounding the leading edge is another randomly chosen feature to be excluded.

Unlike the arguments above, Claim 1 does actually speak to a surrounding adaptor. Specifically, the third limitation requires "providing a spring steel adapter surrounding said leading end external cylindrical surface for snap fitting." '488 Patent col.10 ll.1-2.  Since the lugs securing the Accused Connectors' adaptor protrude above the adapter, Bridgeport's position is that this design cannot meet the "surrounding" limitation.

Arlington retorts that "surrounding" does not require the "connectors' being 'completely encircled' by the adapters." (Pl.'s Br. at 9, Doc. 99.)  In particular, Arlington seeks to apply the construction of the term from the '0485 Action where Judge Conner interpreted "'surrounding' as significantly bordering, rather than completely encircling . . . meaning that a part of the underlying connector is necessarily exposed through the gap in the adaptor." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 290 F. Supp. 2d 508, 521 (M.D. Pa. 2003). Arlington believes that this interpretation should persist in this action as these patents have "similar disclosures"[7] and there is "no justification for importing Bridgeport's 'completely

---

[7] Arlington repeatedly represents that the '050 Patent is a sibling of the '106 Patent, which in turn was incorporated entirely into the '488 Patent, the patent at issue.  (*See* Pl.'s Reply Br. at 15 n.7, Doc. 112.)  In regard to "sibling patents," the Federal Circuit has "held that the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application."  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998) (citing *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990)) ("when two patents using the same claim term both stem from the same parent

encircling' limitation into claim 1."  (Pl.'s Reply Br. at 13-14, Doc. 112.)

As noted above, I will reject the invitation to automatically import claim constructions into the instant case.  Thus, while a similar claim construction may ultimately apply, it is too soon to exclude this relevant design explicitly mentioned within Claim 1.  Therefore, this design change is not a randomly chosen feature to be excluded and Arlington's motion will be denied in this regard.

## 2.    Judicial Estoppel

Arlington further argues that Bridgeport's representation that the external adaptor ring surrounds the leading edge of the Accused Connectors differently than the Enjoined Connectors is contrary to its previous position taken before the Court.

Judicial estoppel "is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).  The theory "is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  *Id.* (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981), p. 782).  It is appropriate where: (1) "the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding"; (2) "the party changed his or her position in bad faith, *i.e.*, in a culpable manner threatening to the court's authority or integrity"; and (3) "the use of judicial estoppel is tailored to address the affront to the court's

---

patent application, the prosecution histories of both are relevant to an understanding of the term in both patents").

authority or integrity." *Dam Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 559 (3d Cir. 2002) (quoting *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777 (3d Cir. 2001)).  "Judicial estoppel 'is an extraordinary remedy' that should be employed only 'when a party's inconsistent behavior would otherwise result in a miscarriage of justice.'"  *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir. 2001) (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir.1996)).

Since the external adaptor ring on the Accused Connectors is "held in place by two lugs protruding from the sides of the leading end which extend through the adaptor to the outside of it," Bridgeport contends that it is therefore impossible for this ring to surround the adaptor itself.  (Br. in Opp'n at 37, Doc. 74.)  However, in its Pretrial Memorandum to the '0485 Action, Bridgeport did not dispute that the Accused Connectors had "a circular spring metal adaptor surrounding said leading end."  (Pl.'s Ex. 2 at 3, Doc. 102-2.)  Bridgeport responds that an admission "under a different court's construction of the limitation 'surrounding' in a different case involving a different patent is hardly a stipulation that is binding on Bridgeport in the context of this contempt proceeding."  (Def.'s Br. at 19, Doc. 107.)

Bridgeport has not admitted that the adaptors surround the Accused Connectors in conformity with every possible construction of the word "surround."   And, while acknowledging that these are related lawsuits, I will not endeavor today to construe the term "surround" as it shall apply to the instant case.  Instead, Bridgeport is bound to exactly what they admitted in the '0485 Action.  Since Judge Conner construed surrounding "as describing an adaptor that significantly borders the circumference of the 'leading end' of the connector,"

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 290 F. Supp. 2d 508, 521-22 (M.D. Pa. 2003), Bridgeport shall be judicially estopped insofar as it has admitted that the Accused Connectors have a circular spring metal adaptor that significantly borders the circumference of the leading end of the connector.[8]

What this means, exactly, is open to dispute.  Arlington attempts to go a step further and posits that this is an admission there is no difference between the Enjoined and Accused Connectors because Bridgeport admitted to this same construction when it admitted infringement as to the Enjoined Connectors, an argument I have consistently rejected.  In particular, as Bridgeport points out, a different construction of the term "surrounding" would render this issue moot.  Therefore, as there is room for argument within this admission, judicial estoppel will not necessarily preclude Bridgeport's argument as to the steel adaptor surrounding the leading edge and Arlington's motion on this issue will be denied.

### D.    Any Additional Randomly Chosen Features

Arlington argues that Bridgeport raised only four purported differences in its brief in opposition to the motion for contempt, and seeks to preclude Bridgeport from raising any additional modifications at the upcoming hearing on contempt.  In particular, Arlington cites to a list of allegedly irrelevant features including the Accused Connectors' ability to be removed after years of use, to revolve around its connector, and its "angle of acceptance." (Pl.'s Br. at 10-11, Doc. 99.)

This issue appears to be a non-starter.  In its brief in opposition, Bridgeport proposes that it has a right to "offer this evidence" (Doc. 107 at 13), and similarly explained at oral

---

[8]In fact, at oral argument, Bridgeport clearly represented that while it did not agree with that particular construction, it could not contest that the Accused Connector met that construction.

16

argument that Dr. Williamson's explanation of additional differences are not themselves differences relied upon, but are illustrative of the importance of the core design changes. In other words, Bridgeport appears to be defending its right to present evidence substantiating the significance of the changes made.  While some of this evidence may ultimately be irrelevant,[9] at this juncture Arlington's motion will be denied on this point.

IV.   **Bridgeport Fittings, Inc.'s Motion to Exclude Testimony of Dr. Christopher D. Rahn Pursuant to Federal Rules of Evidence 702 (Doc. 104)**

Bridgeport is seeking to preclude aspects of the testimony of Dr. Christopher D. Rahn, Arlington's expert consultant and testifying witness.  Because the balance of these objections go to the weight rather than the admissibility of Dr. Rahn's opinions, they will be denied. However, Dr. Rahn will be precluded from testifying as to Bridgeport's mental state.

A.   **Dr. Rahn's Standard Deviation Analysis**

Bridgeport argues that Dr. Rahn's use of a standard deviation analysis is unreliable and should be precluded by the standard set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).   *Daubert* requires that a court evaluating expert testimony consider factors such as:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citation omitted).

As previously explained, the conical (versus cylindrical) nature of the Accused

---

[9]As explained above, the only relevant changes to the contempt analysis are those made to the specific limitations at issue.  *TiVo*, 646 F.3d at 882.

Connectors is of particular significance in the instant action.  In analyzing the different connectors, Dr. Rahn states that "[t]he best way to quantify whether a surface has the approximate form of a cylinder is to measure diameters evenly distributed across the surface and calculate the standard deviation of the surface shape from a perfect (right circular) cylinder with a fixed diameter along its length."  (Rahn Decl. at ¶ 16, Doc. 53.)  Dr. Rahn, however, testified at his deposition that he had no basis for this assertion in the form of any treatise or peer reviewed article or publication, nor had he spoken with anyone in his profession about it.  (Rahn Dep., 170:10-171:4, June 11, 2012; Doc.  106-1.)  He also admitted that he had found no American Society of Mechanical Engineers ("ASME") standards for this "very specific application," and that he felt that this was the best method as it "mad[e] sense to try to use something that's kind of the industry standard for calculating a deviation."  (*Id.* at 168:22-169:4, 169:17-170:9.)  Further, Dr. Rahn stated at his deposition that he had not "come up with a number that is the limit for the standard deviation of something that would be cylindrical."  (*Id.* at 190:5-7, 190:17-24.)

Conversely, Bridgeport–through its expert–argues that there is a generally accepted method set forth by ASME and the American National Standards Institute.  Arlington retorts that, in his Second Declaration, Dr. Rahn explains that while he considered this approach, "the standard deviation includes many diameters and gives a more representative deviation from a perfect cylinder for the entire surface."  (Rahn Second Decl. at ¶ 19, Doc. 95-4.)  As to this particular contention, there is no evidence before the Court that the ASME method is more reliable or accepted for such uneven surfaces.

"Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility."  *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).  "The test

of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.  Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'"  *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) *amended*, 199 F.3d 158 (3d Cir. 2000) (quoting *Kannankeril*, 128 F.3d at 806).  As such, this expert testimony will be allowed.   Standard deviation is a reliable methodology.   That there may be a better methodology for this particular application is of no consequence where, as here, it is supported by valid reasoning.  *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406 (3d Cir. 2003) ("Indeed, in *Daubert*, the Supreme Court specifically held that Rule 702 overruled the requirement that an opinion must gain general acceptance in order to qualify as admissible expert testimony; instead general acceptance and peer review are only two of the factors that a district court should consider when acting as gatekeeper."); *Lentz v. Mason*, 32 F. Supp. 2d 733, 746 (D.N.J. 1999) (finding that expert "need not have used the best method available, only a reasonable one.").

Therefore, although perhaps not the very best method for calculating cylindricity, Dr. Rahn's methodology is supported by valid reasoning and will be allowed.  As Bridgeport argued in regard to Arlington's motions, the upcoming contempt hearing will be before the Court and not a jury and will therefore be less susceptible to prejudicial error.  Of course, at the contempt hearing, Bridgeport is free to renew these concerns at argument and I will weigh the expert opinions accordingly.

### B.    Dr. Rahn's Extrapolation of Measurements to the Entire Product Universe

Bridgeport takes issue with Dr. Rahn's assumption that his measurements apply to the entire population of both Enjoined and Accused Connectors.  Bridgeport alleges that this

is a sampling error and that Dr. Rahn should have calculated a confidence interval for his sample.

This argument, however, is essentially without merit.  In support of its position, Bridgeport cites solely to *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1316-18 (Fed. Cir. 2006), where an expert conducted an analysis of only one of sixteen different infringing products, which is not the case at bar.  Instead, here, there has been no serious contention that the products tested are not representative, or that there are such flaws with the manufacturing process that they have been rendered questionable.  In fact, Arlington represents that the engineering tolerances only allow for only a five-thousandths of an inch variation (Pl.'s Br. at 18, Doc. 121), and there is no assertion that these tolerances are not adhered to.  Moreover, the suggestion that an essential difference between the Enjoined and Accused connectors could be eliminated through statistical variation is itself troubling.

Finally, this argument was raised in rejected in the '0485 Action.  There, Bridgeport also argued "that Rahn measured an insufficient number of connectors, that he failed to conduct a statistical analysis of his results, and that he neglected to account for manufacturing variances inherent in the accused products' mass production."  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 658 F. Supp. 2d 630, 636 (M.D. Pa. 2009).  Judge Conner rejected that argument, finding that Bridgeport had failed to offer any evidence or case law to substantiate such claims.  *Id.*  Such is also the case at bar.

Therefore, as this argument finds no support, it will be denied in the instant action.  Yet, as above, Bridgeport is free to renew these issues at argument as they pertain to the weight of the evidence considered at the contempt hearing.

20

### C.   Dr. Rahn's Measurements from Patent Drawings

Bridgeport contests Dr. Rahn's calculations derived from measurements of figures within the '488 Patent as no measurements are identified anywhere within the Patent itself, but that these were derived solely by Dr. Rahn for this lawsuit.

At bottom, this is a disagreement about what exactly can be gleaned from a patent drawing.   The Southern District of New York was firm in explaining "that precise measurements should not be made, and should not be considered by a court, where the drawings and figures from which those measurements are derived are silent as to scale and proportion."  *Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co., Ltd.*, 812 F. Supp. 2d 547, 563 (S.D.N.Y. 2011).   Similarly, the Federal Circuit opined that "arguments based on drawings not explicitly made to scale in issued patents are unavailing."  *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005).   However, more recently, the Board of Patent Appeals and Interferences resolved this rule into a more nuanced proposition:

> where precise measurement or considerable and careful evaluation of an illustration in a prior art reference or in a prior application are required in order to demonstrate that the illustration meets a dimensional limitation of a claim, findings or conclusions based upon such evaluation will be disfavored or assigned little weight when the prior art reference lacks explicit disclosure that the drawings are to scale or that the particular elements at issue possess some particular dimensional relationship.

*Ex Parte Hideo Matsunaga & Masaomi Hiruta*, No. 2009-014954, 2012 WL 260128, at *3 (B.P.A.I. Jan. 25, 2012).

Essentially, patent drawings are not to be heavily relied upon and courts are restricted from "reading *precise* proportions into patent drawings which do not expressly provide such proportions."  *Cacace*, 812 F. Supp. 2d at 564 (emphasis added).   However, even where

evidence is improper, it does not need to be excluded, especially in a case such as this where there will be no jury.

In particular, Bridgeport first contests Dr. Rahn's determination (derived from Figure 15 within the '488 Patent) that the Figure "discloses a leading end external cylindrical surface with a standard deviation of 1% from a perfect cylinder." (Rahn Dec. at ¶ 42, Doc. 53.) From this, Dr. Rahn proceeds to conclude that "surfaces on the outside of the leading end that are not perfect cylinders were contemplated by the patentees as being cylindrical." (*Id.*) Arlington responds that it does not seek to present the aforementioned evidence in its case-in-chief, but only in rebuttal to Bridgeport's contention–based on Figure 6 of the '488 Patent–that the patent only pertains to cylinders with "straight, parallel sides." (Def.'s Br. in Opp. at 28, Doc. 74.)

Second, Bridgeport contests Dr. Rahn's opinion that the lip of the connector exemplified in Figure 6 of the '488 Patent had a "45 degree chamfer" (Rahn Second Decl. at ¶ 37, Doc. 95-4.) At his Deposition, Dr. Rahn stated that this was a potential embodiment of the "slight incline to permit insertion" referenced in the patent, (Rahn Dep. at 99:14-20, Doc. 106-1), but also admitted that he derived this angle measurement by only superimposing a 45-degree line on the Figure in the PDF viewer (*Id.* at 100:1-101:21). He did also note, however, that the commercial embodiment "looks very similar to what was disclosed in the '488 patent." (*Id.* at 223:9-224:4.)

As above, this issue ultimately comes down to the weight, rather than the

admissibility, of the proffered evidence.  And, as Bridgeport has consistently noted,[10] the upcoming hearing–in lacking a jury–is not particularly susceptible to this sort of prejudice. Therefore, while the probative value of these particular pieces of evidence seems fairly low, it is not apparent that it is so low as to wholly preclude this evidence, and the motion will be denied in this regard, without prejudice.  Inasmuch, Bridgeport is free to raise these objections at hearing so that they can be reviewed in the context of the proceedings.

### D.    Dr. Rahn's Irrelevant Measurements from Engineering Drawings

Bridgeport argues that the focus of the contempt proceeding should be on the Accused Connectors rather than on the corresponding engineering drawings.

It is true that, in a contempt proceeding, a "court must focus on the products rather than on the patent itself."  *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93, 98 (3d Cir. 1981). This, however, does not necessarily exclude engineering drawings.  Instead, Bridgeport's argument is that "[a]lthough engineering drawings may exemplify what a manufacturer intends to make, in the case of mass produced items such as the Accused Connectors, they cannot account for all manufacturing variances."  (Def.'s Reply Br. at 17, Doc. 122.)  This argument is unavailing–these designs have strict tolerances and there are no representations that products falling outside of these specifications are allowed to be sold. Instead, more compelling is Bridgeport's argument that Dr. Rahn has not properly considered these tolerances in using only the target value from the specs.  (Rahn Dep. at 146:19-147:1, Doc. 106-1.)

---

[10]In fact, at oral argument, Bridgeport explicitly stated that the measurements made from the patent and engineering drawings should potentially be admitted in accordance with its "more is better" position in regard to Arlington's motions *in limine*.

There is noting prohibiting the inclusion of measurements made from these engineering drawings.  They are highly relevant to the products that Bridgeport is intending to make, and to any extent these measurements fail to account for variations in the manufacturing process, this goes to the weight of the evidence and it is a factor that can be sufficiently addressed at the contempt hearings.  This aspect of Bridgeport's motion will thus be denied.

###### E.    Dr. Rahn's Millivolt Drop Tests

In order to test Bridgeport's contention that the Accused Connectors were given a modified shape to increase their conductivity, Dr. Rahn performed conductivity tests not on actual Bridgeport products, but on prototypes "made by Arlington to [his] specifications." (Rahn Dep. at 37:7-38:17, Doc.  106-1; Rahn Second Decl. at ¶ 58, Doc. 95-4.)  These prototypes were lost for a period, but are now available for investigation.

Bridgeport argues primarily that these tests are irrelevant to the instant matter as these prototypes were made for a different lawsuit and that they were not done on any actual Bridgeport product.   Arlington responds that the tests were done to specifically test Bridgeport's claim that a taper increases conductivity, and that the evidence is therefore relevant since Dr. Rahn ultimately concluded "that the taper on the external cylindrical surface does not significantly change the grounding in the Accused Products."  (Second Rahn Decl. at ¶ 59, Doc. 95-4.)  Bridgeport clarified at oral argument that the conical shape does not increase conductivity *per se*, but creates a more reliable connection and that Arlington's tests are therefore irrelevant.

Again, while tests on a theoretical product are not highly probative, this part of the motion will be denied as Dr. Rahn's analysis is potentially relevant.   While Bridgeport's

24

objections are well taken, it is invited to renew these arguments at the contempt hearing where Dr. Rahn will presumably expand on this theory and its implications in the present matter.

### F.    Dr. Rahn's Opinions about Bridgeport's Intent

Bridgeport takes issue with Dr. Rahn's characterizing its state of mind.  Of course, Federal Rule of Evidence 703[11] requires that expert opinion be founded on "opinion on facts or data in the case that the expert has been made aware of or personally observed."  And, here, Dr. Rahn admitted at his deposition that these statements were derived from "just common sense."  (Rahn Dep. at 200:11-24, Doc.  106-1.)  Aside from that this opinion is outside of Dr. Rahn's expertise, such statements of "intent [are] not a proper subject for expert testimony."  *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004).

Arlington responds that Dr. Rahn is not trying to read Bridgeport's mind, but that he is merely demonstrating the infringing aspects of Bridgeport's promotional and advertising materials.  While this may be appropriate, this is not what is at issue.  In particular, the statements Bridgeport seeks to preclude include Dr. Rahn's opinions that Bridgeport had "knowledge that use of the Accused Connectors results in infringement of the '488 Patent" (Rahn Decl. at ¶ 63, Doc. 53), that "Bridgeport actively and knowingly induces its end-users to carry out acts that Bridgeport knows constitute direct infringement" (*Id.* at ¶ 64), and that "Bridgeport intends for the customers to use the products in an infringing manner and knows that if the products are used, they will infringe the '488 Patent" (*Id.* at ¶ 65).

---

[11] Federal Rule of Evidence 703 pertains to "Bases of an Expert's Opinion Testimony."

These are explicit opinions as to Bridgeport's statement of mind, and Dr. Rahn has no basis to testify as such.  Expert testimony is "admissible only insofar as it assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998).  Thus, it is improper for an expert to opine on common sense matters as this is the realm of the fact finder.  *Id.*; *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) (explaining that the 1972 Advisory Committee notes to Federal Rule of Evidence 702[12] "make it clear that when the layman juror would be able to make a common sense determination of the issue without the technical aid of such an expert, the expert testimony should be excluded as superfluous.").

As such, this particular opinion testimony as to state of mind is irrelevant, without an expert basis, and will be excluded.

## CONCLUSION

A contempt hearing is bound to consider only the alterations between the infringing and modified product.  Therefore, I will grant in part Arlington's Motion *in Limine* to Exclude Bridgeport's Arguments and Evidence Concerning Unmodified Features of the Accused Products and Bridgeport's Waived Defenses (Doc. 100), and Bridgeport will be precluded from presenting arguments of non-infringement pertaining to any limitation unaffected by the redesign of its connectors.  Specifically, limitations two and three are the only limitations that will be at issue in the upcoming contempt hearing.  However, I will not automatically incorporate Arlington's earlier claim constructions into the instant motion for contempt.

---

[12]Federal Rule of Evidence 702 pertains to "Testimony by Expert Witnesses."

As contempt proceedings are limited to the specific limitations of the asserted claims, I will also grant in part Arlington's Motion *in Limine* to Exclude Bridgeport's Arguments and Evidence Concerning Randomly Chosen Features (Doc. 98) to the extent it seeks to preclude the purported lack of a lip and the lack of a smooth surface as randomly chosen features.   However, Bridgeport will be allowed to present evidence as to the lack of an adapter fully surrounding the leading edge, and Arlington's motion will be also denied insofar as it seeks to preclude additional, relevant differences proposed by Bridgeport's expert.

Finally, Bridgeport's Motion to Exclude Testimony of Dr. Christopher D. Rahn Pursuant to Federal Rules of Evidence 702 (Doc. 104) will be denied except to the extent it seeks to preclude Dr. Rahn's Opinions about Bridgeport's Intent.

An appropriate order follows.

 August 17, 2012               /s/ A. Richard Caputo
Date                                        A. Richard Caputo
                                                 United States District Judge

27