**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ARLINGTON INDUSTRIES, INC.,

      Plaintiff,

          v.

BRIDGEPORT FITTINGS, INC.,

      Defendant.

CIVIL ACTION NO. 3:02-CV-0134

(JUDGE CAPUTO)

## MEMORANDUM

Pursuant to this Court's determination that Defendant Bridgeport Fittings, Inc. ("Bridgeport") was in contempt of the Court's January 18, 2012 Order (Doc. 46) entering Bridgeport's Confession of Judgment and Injunction (Doc. 47), the Court must now resolve the issue of lost profits as well as attorney's fees and expenses. The parties were instructed to submit evidence of lost profits for sales made in violation of the Confession of Judgment and Injunction, and each side has done so. Arlington Industries, Inc. ("Arlington") has also submitted records regarding attorney's fees and expenses and both sides have submitted evidence of the reasonableness of these amounts. For the reasons that follow, the Court concludes that Arlington has demonstrated its entitlement to **$495,648.79** in lost profits and **$33,918.61** in prejudgement interest, calculated using the IRS overpayment rate. Arlington is also entitled to **$1,527,632.35** in attorney's fees and **$282,839.55** in costs and expenses.

## BACKGROUND

The background of this case is detailed in the Court's Memorandum and Order entered on March 19, 2013 (Docs. 192 and 193), *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, No. 02-cv-134, 2013 WL 1149230 (M.D. Pa. Mar. 19, 2013). In that

Memorandum and Order, the Court granted Arlington's motion to hold Bridgeport in contempt for violating the Confession of Judgment and Injunction (Doc. 47).  The parties were instructed to "attempt to resolve the questions of lost profits and attorneys' fees amicably."  *Arlington Industries*, 2013 WL 1149230, at *16, n.18.  As the issues of lost profits and attorney's fees have yet to be resolved, the Court is now faced with this task.

## DISCUSSION

### A.    Lost Profits

In the contempt setting, "the innocent party is entitled to be made whole for the losses it incurs as the result of the contemnors' violations, including reasonable attorneys' fees and expenses."  *Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 941 (3d Cir. 1995) (citing *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 400–01 (3d Cir.1994)).  With respect to lost profits, the parties agree that a patentee must establish a reasonable probability that "but for" the infringing sales, it would have made the infringer's sales.  *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003).  "To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product."  *Id.* (citing *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir.1999)).  However, "[a] patentee may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).

As an initial matter, Bridgeport asserts that "Arlington may only recover damages for those uses of the New Connectors that practice every step of the method claimed in the '488 Patent."  (Doc. 218, 9.)  However, as Arlington points out, the Injunction entered in this case enjoined Bridgeport from "making, using, selling, offering for sale or importing or causing or inducting others to make, use, sell, offer to sell, or import" Bridgeport's 590-DCS and 590-DCSI or any colorable imitations of such.  (Doc. 47, ¶ 2.) The injunction applied to all uses of these products, and did not create an exception for

certain permissible uses of these products.  Therefore, the Court is not persuaded by Bridgeport's argument that Arlington is not entitled to recover lost profits on 100% of Bridgeport's sales simply because Arlington cannot show that every use of the New Connectors violates the '488 patent.

As to lost profits, Arlington asserts that it can demonstrate its entitlement to lost profits under either the "two supplier" market theory or under the *Panduit* test, set out in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978).  *See, e.g. Micro Chem*, 318 F.3d at 1122 ("The *Panduit* and two-supplier market tests are recognized methods of showing 'but for' causation.") Both theories are addressed below.

### 1.    Two-Supplier Market Theory

Under the two-supplier market theory a patentee must show "1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales."  *Id.* at 1124 (citations omitted).

With respect to the first factor, that the relevant market contains two suppliers, Bridgeport argues that there were numerous competing products in the market, and thus it had more than two suppliers.  (Doc. 218, 15-16; *Cerasale Decl.*, Doc. 227-2,¶ 22-30.) However, in support of its contention that the market contained only two suppliers, Arlington submits a declaration from Arlington Vice President Thomas Gretz ("Gretz"), asserting that every product identified by Bridgeport, except the Sigma Connectors, was on the market before Arlington was awarded supplemental damages in the '0485 Action.[1]  *See Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, No. 01-cv-0485, 2013 WL 3773836 (M.D. Pa. July 17, 2013); (*Gretz Decl.*, Doc. 238-2, ¶¶ 12-15, 17-27).  In

---

[1]    The "'0485 action," No. 3:01-CV-0485, commenced on March 19, 2001 in this district for infringement of U.S. Patent Nos. 5,266,050 and 5,171,164 against Bridgeport's entire line of Snap-in connectors.  The action was assigned to Judge Conner.  Shortly thereafter, Arlington filed the instant action for infringement of U.S. Patent No. 6,335,488 against a subset of Bridgeport's products accused in the '0485 Action.

the '0485 action, Judge Conner concluded that "Bridgeport and Arlington continued to compete in a two-supplier market during the contested period" despite Bridgeport's assertions that the market was not a two supplier market because of the existence of these purportedly competing products.  *Id.* at *4.  The Court sees no reason to depart from this conclusion.

As to the Sigma "private label" products not considered in the '0485 Action, Gretz asserts that 38ACDS (Sigma's Cut-In Connector) and 38ADS (Sigma's Double-Snap Connector), collectively, the "Sigma Connectors," do not constitute acceptable non-infringing substitutes to Arlington's Snap2It Connectors or Bridgeport's Colorable Imitations.  (*Gretz Decl.*, Doc. 238-2, ¶ 30).  Gretz bases this determination on differing design features and differences in use and states that neither Sigma connector is an acceptable non-infringing substitute since they do not share the advantages that motivated purchasers to buy either the Arlington or Bridgeport products.  *Id.* at ¶¶ 31-32. Based on these representations, the Court is satisfied that the relevant market contained two suppliers, Arlington and Bridgeport, during the relevant period.  Therefore, the first factor of the two supplier market theory is met.

Looking to the second factor, Arlington's own manufacturing and marketing capability, Arlington contends that it would have had the capability to make the sales that were made by Bridgeport during the relevant time period.  *See Gretz Decl*; Doc. 238-2, ¶ 42, *Gallagher Decl.*, Doc. 238-4, ¶¶ 60-64.  Bridgeport does not appear to dispute this assertion.  Therefore, the Court is satisfied that Arlington would have had the manufacturing and marketing capability to make the sales that were diverted to the infringer.

With respect to the third factor of the two-supplier market theory, the amount of profits that would have been made on the sales made in contempt of the Injunction, Arlington provides Mr. Gallagher's methodology (Doc. 222-15, ¶ 5) indicating a sum of $495,648.79 in lost profits.  Mr. Gallagher was also  retained by Arlington in the '0485 action to make a similar calculation.  *Id.* at ¶ 3, *see also Arlington*, 2013 WL 3773836 at

*6.  Bridgeport, through the declaration of Carol Ludington, argues that Arlington's damage calculations are unsupported and overstated.  (*Ludington Decl.*, Doc. 253, ¶ 8.)  For example, Ludington asserts that Arlington's damage claim is inflated because it is based on Arlington's historical average prices which were approximately 12% to 15% higher than those for Bridgeport's Colorable Imitations.  *Id.* at ¶ 72, 54.  While Arlington's prices have been higher than Bridgeport's prices, a similar price elasticity argument was rejected in the '0485 action, and there is no evidence to suggest that Arlington's higher prices would impact customers buying the product for the patented features.  (*Gallagher Decl.*, Doc. 238-4, ¶ 74.)

Ludington further argues that Bridgeport developed significant brand loyalty among its customers, which could have decreased demand for Arlington's products.  (*Ludington Decl.*, Doc. 253,  ¶ 51-52.)  However, as Gallagher notes, in making this argument Bridgeport attempts to capitalize on customer goodwill from selling the Colorable Imitations in violation of the Injunction that was already in place.  (*Gallagher Decl.*, Doc. 238-4, ¶ 77.)  The Court is not persuaded by the argument that customer brand loyalty towards Bridgeport impacts the amount of profits Arlington would have made from the sales diverted to Bridgeport.  Therefore, Arlington has demonstrated its entitlement to lost profits under the two supplier market theory.

As to the amount of damages, Bridgeport argues that Arlington is only entitled to recover damages based upon its actual loss and that "undisputed evidence" shows that 73% of the Colorable Imitations were used for applications other than with junction boxes.  (Doc. 218, 14; Doc. 200 ¶ 10.)  Accordingly, Ludington asserts that Arlington's damage calculations are overstated because they include non-infringing sales by Bridgeport.  (*Ludington Decl.*, Doc. 253, ¶¶ 8-13.)  As an initial matter, the "undisputed evidence" provided by Bridgeport that 73% of Bridgeport's Colorable Imitations were used for applications other than with junction boxes was an estimate provided by Eric Cerasale, technical sales manager for Bridgeport, "based on [his] understanding of Bridgeport's end-users, the engineering community, and how they specify project and

design." (Doc. 200, ¶¶ 10, 1.) Moreover, as noted above, the Contempt Order stated that Bridgeport was "permanently enjoined from directly or indirectly making, using, selling, offering for sale or import or causing or inducing others to make, sell, use, offer to sell, or import the Whipper-Snap 380SP and 38ASP model connectors during the remaining term of U.S. Patent No. 6, 335,488." (Doc. 193, ¶ 5.) Therefore, the Court is unpersuaded that 73% of Bridgeport's sales of the Colorable Imitations should not be included in the lost profits calculation.

In addition, Bridgeport argues that Arlington "simply assumes that it is entitled to recover 100% of its lost profits without presenting an iota of evidence on market conditions." (Doc. 218, 12.) In an attempt to challenge this "assumption" Ludington asserts that market conditions and other considerations demonstrate that it is not reasonable to assume that Arlington would have made Bridgeport's assumed sales. (*Ludington Decl.,* Doc. 253, ¶ 14.) However, in the '0485 action, Gallagher's same calculation of lost profits was adopted through December 4, 2011. Gallagher Decl. ¶¶ 30, 33. The parties do not specifically indicate, and the Court remains unconvinced that market conditions have changed significantly from December 5, 2011 through March 19, 2013 in a way that would affect Arlington's entitlement to lost profits. *Id.* at ¶ 33.

Bridgeport also argues that a prior injunction on its Colorable Imitations "empirically demonstrates that Bridgeport's customers will not automatically purchase" Arlington's connectors. (Doc. 218, 17.) It asserts that "[b]ecause Arlington cannot show that it would have captured all of Bridgeport's sales of the [Colorable Imitations] during the damages period, this Court cannot award Arlington's lost profits on 100% of Bridgeport's sales." *Id.* However the Court is not persuaded that customer behavior during the injunction period dictates Arlington's entitlement to lost profits.

Under the two-supplier market theory, Arlington is entitled to lost profits using Mr. Gallagher's method.

### 2.    Panduit Test

Alternatively, under the *Panduit* test, to obtain lost profits as damages a patentee must prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit*, 575 F.2d at 1156.  In terms of demand for the patented product, Arlington asserts, based on declarations from Gretz and Gallagher, that there is and was substantial demand for Arlington's patented product and that Bridgeport has failed to dispute this demand. Specifically, Gallagher notes that Arlington's 38AST Connector is Arlington's number one selling product.  (*Gallagher Decl.*, Doc. 238-4, ¶ 38.)  Moreover, during the relevant time period, Arlington had an increase in sales for the patented connectors.  (*Gretz Decl.*, Doc. 238-2, ¶ 41.)  Based on the representations from Gretz and Gallagher, the first element of the *Panduit* test is satisfied.

With respect to the second element, the availability of acceptable non-infringing substitutes, as noted above with respect to the first factor of the two-supplier market theory analysis, acceptable non-infringing substitutes were not on the market during the relevant time period.  In addition, as explained above, Arlington has demonstrated both manufacturing and marketing capability as well as calculability of lost profits, meeting the final two elements of the *Panduit* test.

### 3.    Lost Profits Conclusion

For the foregoing reasons, based on either the two-supplier market theory or the Panduit test, Arlington is entitled to lost profits in the amount of **$495,648.79**.

### B.    Pre-judgment Interest

The decision of whether or not to award prejudgment interest is within the sound discretion of the trial court.  *Booker v. Taylor Milk Co.*, 64 F.3d 860, 868 (3d Cir. 1995).

Prejudgment interest should be awarded "in response to considerations of fairness and denied when its exaction would be inequitable." *Id.* (internal citations omitted).

This Court has recently relied on the IRS overpayment rates in 26 U.S.C. § 6621(a)(1) for an award of prejudgment interest.   *See Supinski v. United Parcel Serv., Inc.*, 3:06-CV-00793, 2012 WL 2905458, at *4 (M.D. Pa. July 16, 2012) (internal citations omitted) (providing a detailed explanation of calculating interest owed using IRS overpayment rates).

Prejudgment interest will be calculated based on the lost profit figures presented by Mr. Gallagher for the periods of December 5, 2011 to December 31, 2011; January 2012 to December 2012; and January 1, 2013 to March 19, 2013, respectively.  The total amount of prejudgment interest to be awarded is **$33,894.87**.[2]

---

[2]     The Chart below contains the calculations for the amount of prejudgment interest owed based on the lost profits for the three time periods provided by Mr. Gallagher.  (Doc. 222-18, Ex. C, Sch. 1A).

Lost Profit Amount
$24,133.88

| Time Period | Rate | Time | Amount Owed |
|---|---|---|---|
| Dec. 5, 2011-Dec. 31, 2011 | 3% | 26 days | 51.57168817 |
| Jan 1, 2012 - Dec. 31, 2013 | 3% | 24 mo. | 1448.0328 |
| Jan 1, 2014-May 31, 2014 | 3% | 5 mo. | 301.6735 |
| June 1, 2014-June 20, 2014 | 3% | 20 days | 39.67213151 |
| | | | **1840.95012** |

$375,241.5

| Time Period | Rate | Time | Amount Owed |
|---|---|---|---|
| Jan. 1, 2012- Dec. 31, 2012 | 3% | 12 mo. | 11257.2456 |
| Jan. 1, 2013-May 31, 2014 | 3% | 17 mo. | 15947.7646 |
| June 1, 2014-June 20, 2014 | 3% | 20 days | 616.8353753 |
| | | | **27821.84558** |

$96,273.38

| Time Period | Rate | Time | Amount Owed |
|---|---|---|---|
| Jan 1, 2013 - Mar 19, 2013 | 3% | 78 days | 617.2046827 |
| Mar 20, 2013-Mar 31, 2013 | 3% | 11 days | 87.04168603 |
| April 1, 2013 -May 31 , 2014 | 3% | 14 mo. | 3369.5683 |

## C.     Attorney's Fees

Arlington requests a total of $2,380,704.65 in attorney fees (not including pre-judgment interest) incurred in connection with its motion for contempt.  The starting point for a court's determination of reasonable attorney's fees is to calculate the "lodestar" by multiplying the number of hours reasonably expended by each attorney by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).  The party seeking fees has the initial burden of presenting evidence that the claimed rates and amounts of time are reasonable.  *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986).  Once the fee applicant has made this initial showing, "the resulting product is presumed to be the reasonable fee to which counsel is entitled."  *Id.*  (quoting *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)).  The opposing party then has the burden of making specific objections to the proposed fee by affidavit or brief.  See *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990).  In considering the objections, the district court has significant discretion to adjust the lodestar downwards.  *Id.*

The first step in the lodestar calculation is the determination of the number of hours reasonably expended. The court begins with the claimed hours for which the applicant has evidentiary support, and then makes deductions, if necessary, as follows:

> The district court should exclude hours that are not reasonably expended.
> Hours are not reasonably expended if they are excessive, redundant, or
> otherwise unnecessary.  Further, the court can reduce the hours claimed
> by the number of hours "spent litigating claims on which the party did not

---

| | | |
|---|---|---|
| June 1, 2014-June 23, 2014 | 3%  23 days | 181.996526 |
| | | **4255.810921** |
| | | **$33,918.61** |

> succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Institutionalized Juveniles* [*v. Sec'y of Pub. Wellfare*], 758 F.2d [897, 919 (3d Cir.1985) ] (quoting *Hensley*, 461 U.S. at 440). The court also can deduct hours when the fee petition inadequately documents the hours claimed. *Hensley*, 461 U.S. at 433.

*Id.* (citations omitted).  In determining whether the number of hours claimed is reasonable, the court may divide the claimed hours according to the type of work performed.  See, e.g., *Maldonado v. Houstoun*, 256 F.3d 181 (3d Cir. 2001).  Hours that would not typically be billed to a client cannot be billed to an adversary.  See *Pub. Interest Research Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995).

The second step in the lodestar determination is determining whether the claimed rates are reasonable.  The court starts with the market rates prevailing at the time of the petition, which the party seeking fees has the burden of establishing by satisfactory evidence.  See *Maldonado*, 256 F.3d 181; *Lanni v. State of N.J.*, 259 F.3d 146, 149 (3d. Cir. 2001).  "[T]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode*, 892 F.2d at 1183.  If there is evidence that the market has established different rates for different categories of legal work, the district court should assign the appropriate rate to each category.  See *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001).

The lodestar carries a strong presumption of reasonableness.  *Id.* at 180.  Once the lodestar has been determined, the court can adjust the lodestar downwards if the amount is not reasonable in light of the applicant's success—or more properly, his lack thereof—in the litigation.  *Rode*, 892 F.2d at 1183.  In certain rare instances, the lodestar may also be adjusted upwards to compensate counsel for exceptionally high quality work or for the risks associated with undertaking the litigation.  *Id.* at 1184.  The "party seeking attorney fees bears the ultimate burden of showing that its requested hourly rates and the hours it claims are reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n. 5 (3d Cir. 2005) (citing *Rode v. Dellarciprete*, 892 F.2d 1177,

1183 (3d Cir. 1990)).  To the extent the opposing party seeks to challenge the fees

sought, "the opposing party must then object 'with sufficient specificity' to the request."

*Id.* (quoting  *Rode*, 892 F.2d at 1183)).

### 1.    Reasonableness of Hours Spent

Bridgeport forcefully objects to the number of hours billed by Arlington's counsel

as excessive, duplicative, and redundant.  As an initial matter, Bridgeport objects to

Arlington's use of "block billing" in maintaining its time records, arguing that Arlington's

documents "do not properly identify what task was being performed or an allocation of

time to a particular task."  (Doc. 257, 12.)  Arlington points out that "block billing is a

common practice which itself saves time" and "will be upheld as reasonable if the listed

activities reasonably correspond to the number of hours billed."  *Schlier v. Rice*, No.

3:04-cv-1863, 2009 WL 5182164, at *6 (M.D. Pa. Dec. 22, 2009).  Therefore, Arlington's

fees are not unreasonable simply because block billing was used to keep track of hours.

However, Bridgeport emphasizes the caveat that block billing is reasonable only "if the

listed activities reasonably correspond to the number of hours billed."  *Id.*  Moreover, "[i]f

a block entry is confusing or makes it difficult to allocate reasonable time to a specific

task, 'the blame lies on the party seeking fees because they were in the best position to

mitigate any confusion.'"  *Dixon-Rollins v. Experian Information Solutions, Inc.*, No. 09-

646, 2010 WL 3734547, at *5 (E.D. Pa. Sept 23, 2010) (citing *U.S. v. NCH Corp.*, No.

05-881, 2010 WL 3703756, at *5 (D.N.J. Sept. 10, 2010)).  Therefore, if the Court could

not differentiate how much time was spent on a given task due to block billing, in making

reductions in hours for duplicative or redundant entries the entire duration of the time

entry was deducted since the party using a block billing system bears that risk.

Bridgeport takes issue with Arlington's assertion that the matter was leanly staffed

because eighteen attorneys billed for time in some form over the course of this case.

(Doc. 257, 9).  However, as Arlington points out, on behalf of Crowell & Moring LLP

11

("C&M"), one partner, Ms. Clune, and two associates, Mr. Zambrzycki and Mr. Katz, were responsible for 92% of the hours billed.  (Arlington Contempt Sanctions Ppt. 122.) Similarly, on behalf of Rhoads & Sinon LLP ("Rhoads"), one partner, Mr. Tribeck, and one associate, Ms. Lavis, were responsible for 87% of the hours billed.  *Id.*  As such, Bridgeport's objection that the case was not leanly staffed is inapposite.

Bridgeport next asserts that Arlington's claimed fees are excessive and duplicative.  (Doc. 257, 10.)  For example, Bridgeport points to the time spent by Clune, Zambrzycki, and Katz in preparing for the depositions of Dr. Rahn, Mr. Herbst, and Dr. Williamson.  In *Shaw v. Cumberland Truck Equipment Co.*, Judge Conner found redundant hours arose from the use of two attorneys to prepare for and participate in depositions.  *Shaw*, No. 09-359, 2012 WL 1130605, at *5 (M.D. Pa. Mar. 30, 2012).  In the present case, the Court agrees with Bridgeport that some of the time spent preparing for these depositions was duplicative.  For example, in June 2012, both Clune and Zambrzycki spent a substantial amount of time preparing for and attending the depositions of Dr. Rahn and Mr. Herbst.   Therefore, the Court will reduce the number of hours that Zambrzycki spent performing the same task as Clune by half (½), resulting in a reduction of **33.125** hours for Zambrzycki.  Similarly, also in June 2012, both Clune and Katz spent a substantial amount of time preparing for and attending the deposition of Dr. Williamson, and the Court will therefore reduce the number of hours Katz spent on these duplicative tasks by half, resulting in a reduction of **18.125** hours.[3]  In addition, on two separate days in December of 2011, Zambrzycki "began drafting" the motion for contempt.  Therefore, his initial entry of **0.75** hours will be excluded.

Also in the category of duplicative billing, in September of 2012 attorneys Clune, Zambrzycki, and Katz each spent a substantial amount of time on essentially the same

---

[3]       As noted above, although block billing is an appropriate practice in this district, where the Court could not glean the amount of time apportioned to a given task, the Court used the entire entry to calculate reductions.

task: formulating Arlington's opposition to Bridgeport's motion for reconsideration. Therefore, each attorney's hours will be reduced by two-thirds (2/3) of the time spent on this task resulting in a decrease of **6.67** hours for Clune, **12** hours for Zambrzycki, and **13** hours for Katz.  Similarly, in March of 2012, Clune, Zambrzycki, and Katz each billed time for beginning to draft Arlington's reply regarding the motion for contempt. Therefore, each attorney's hours will be hours will be reduced in a similar manner, resulting in a reduction of **4.33** hours for Clune, **3.5** hours for Zambrzycki, and **2.17** hours for Katz.  In addition, Clune and Zambrzycki both performed the same task of drafting the direct of Dr. Rahn in October of 2012.  Therefore, each attorney's hours will be reduced by half (½), such that Clune's hours will be reduced by **5.625** and Zambrzycki's hours will be reduced by **7.125**.  In August of 2012, Zambrzycki and Attorney Sonia Murphy both worked on editing power point slides for oral argument for the Daubert hearing.  Therefore, the duplicative time entries for each will be reduced by half (½), resulting in a **6.125** hour reduction for Zambrzycki and a **4** hour reduction for Murphy.  In December of 2012, both Zambrzycki and Katz spent a substantial amount of time drafting questions for Rahn's rebuttal.  Since it appears to be duplicative to have two attorneys working on the same project and Katz appears to have done the lion's share of work on this task, billing 107 hours compared to Zambrzycki's 32.75 hours, Zambrzycki's hours will be reduced by **32.75**.  Finally, Murphy, who Clune said worked primarily on the Daubert motion, spent **4.5** hours reviewing the contempt motions and declarations, which the Court finds duplicative given that other attorneys were performing those tasks.  Therefore, her hours will be reduced by that amount.

Bridgeport also objects to the amount of time spent at the Contempt hearing in October of 2012.  The Court finds that having three C&M attorneys, Clune, Zambrzycki, and Katz,  present for the contempt hearing and each billing full time was redundant. Therefore, the Court will reduce the amount of time billed by Zambrzycki and Katz on the

day of the hearing by half, resulting in a **10.125** hour reduction for Zambrzycki and a **10** hour reduction for Katz.

Bridgeport vehemently objects to the amount of time billed by Arlington's attorneys in preparing for its closing arguments, eventually delivered in February of 2013. (Doc. 257,13.) As Bridgeport notes, by February of 2013, Arlington had already had a chance to prepare for closing arguments three times: at the initial hearing, when it gave its rebuttal on December 17, 2012, and finally on February 20, 2013. *Id.* The Court agrees with Bridgeport that some of the time billed for preparation of the closing in January and February was redundant. Therefore, the Court will reduce the amount of time spent by Clune, Zambrzycki, and Katz on preparing for the closing during these months by half, resulting in a reduction of **89** hours for Clune, **26** hours for Zambrzycki, and **65** hours for Katz.

In addition, Bridgeport objects to entries where Arlington attorneys billed for non-legal tasks. The Court agrees. Hours spent performing non-lawyer tasks that could have been delegated are not recoverable. *Halderman v. Pennhurst St. Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1994). Therefore, Clune's hours will be reduced by a total of **1.5** hours for performing tasks such as sending letters via FedEx and email in December of 2011 and for updating a schedule in July 2012. Similarly, Katz's hours will be reduced by **1** hour for adding color images to a document on February 15, 2012.

Bridgeport specifically objects to Tribeck's time entries that bill for "reviewing unidentified documents for hours, if not days." (Doc. 257, 15.) This Court has previously disregarded time entries that "include broad statements such as 'Review litigation documents,' 'Review documents for Exhibit list,' 'Review pleadings,' 'Review trial exhibits,' and 'Review trial exhibits & documents.'" *Jama Corp. v. Gupta*, Nos. 3:99-cv-01624, 3:99-cv-1574, 2008 WL 108671, at *7 (M.D. Pa. Jan. 4, 2008). As in *Jama*, the Court here will strike Tribeck's entries for vague and unspecified tasks such as

14

"confer with counsel; review docs; review docket; memo re: same," and thus will reduce his hours by a total of **50.33**.[4]  *See* Doc. 222-221.  Along similar lines, Clune billed 10 hours for tasks such as "work on" Arlington's brief, declaration, or motion.  Because these entries are vague and unspecified, the Court will reduce Clune's hours by **10**.  In addition, Associate John Martin billed 10 hours for "research" and "continue research."  Because these time entries are vague and overbroad, these **10** hours will be disregarded.

Tribeck's time sheets contained a total of 126.5 hours of entries that mentioned travel in addition to preparation for, or attending hearings. Given the number of other attorneys preparing for, traveling to, and present at the hearing, rebuttal, and closing, Tribeck's hours for these tasks will be reduced by half, resulting in a **63.25** hour decrease.   Also, paralegal Jodie Koons billed a total of 46 hours for travel to hearings, preparation for hearings, and attending hearings.  As noted above, given the number of attorneys performing the same activity, these entries are duplicative and her hours will be reduced by half, resulting in a **23** hour decrease.[5]

Overall, Clune's hours will be reduced by **107.125**, Zambrzycki's hours will be reduced by **131.5**, Katz's hours will be reduced by **108.295**, and Murphy's hours will be

---

[4]     Bridgeport also asserts that Tribeck billed numerous entries that referenced a "conference with counsel" that were not substantiated by counsel with whom he would have been conferring.  (Doc. 257, 15.)  This 50.33 hour reduction, for entries which frequently contained "conference with counsel," addresses this concern as well.

[5]     C&M attorneys also billed a substantial amount of time for travel.  However, since Clune has represented that the total amount of fees claimed has been reduced by $29,660.00 for travel time related to the contempt proceeding (*Clune Decl.*, Doc. 222-3, ¶ 12), the Court does not find it necessary to make a further reduction in C&M's hours for travel time.

reduced by **8.5**.  Tribeck's hours will be reduced by **113.58**, Martin's hours will be reduced by **10**, and Koons's hours will be reduced by **23**.

### 2.    Reasonable Rates

Generally, attorney's fees should be calculated based on the rates prevailing in the judicial district that is the forum of litigation.  *Interfaith Cmty. Org. v. Honeywell Int'l Inc.*, 426 F.3d 694, 705 (3d Cir. 2005).  However, there are two (2) exceptions to this "forum rate" rule: (1) "where a case requires the 'special expertise of counsel from a distant district'" or (2) "[w]here local counsel are unwilling to handle a case."  *Id.*  In either of these situations, "the 'relevant community' for determining a prevailing market rate is the forum in which the attorneys regularly practice, not the forum of the litigation."  *Id.*

Arlington asserts that Washington, D.C. is the relevant community for determining fees for C&M attorneys because the first exception to the forum rate rule applies: that this case required "special expertise from counsel from a distant district."  *Id.*  In considering whether  the need for the special expertise of counsel from a distant district has been demonstrated, the Third Circuit Court of Appeals has stated that the precise issue is "the extent to which other counsel practicing in [the forum of litigation] did or did not possess 'special expertise' in order to represent [the party]."  *Id.*  The Third Circuit found that without evidence that the party seeking fees conducted a significant search for counsel with the ability to handle the case in the forum of litigation, where " there are hundreds of firms in [the forum] that identify themselves as practicing [the relevant kind of law]," the party failed to make the necessary showing that no local counsel had the expertise necessary to represent the party.  *Id.* at 706.

Here, in its briefs and at argument, Arlington asserts that it qualifies for the first exception to the forum rate rule because patent litigation is a highly specialized field and the Middle District of Pennsylvania "has a relatively small number of attorneys with the requisite expertise to prosecute patent infringement actions" (Doc. 222-2, 10;

*Freedenberg Decl.*, Doc. 222-23, ¶ 12).  The Court agrees that patent litigation is a highly complex and specialized field.  However, this fact, along with Arlington's contention that the Middle District of Pennsylvania has a relatively small number of attorneys with requisite experience does not justify compensating C&M at rate higher than that of the forum of litigation.  The first exception requires a showing that local counsel lack special expertise to represent Arlington, not merely that only a small number of attorneys in the forum may have the requisite experience.  More specifically, to show that a case requires special expertise from a distant district, a party must show that it unsuccessfully attempted to retain counsel in the forum of litigation.  Here Arlington did retain one of the lawyers who, along with his firm, held themselves out as patent lawyers in the Middle District of Pennsylvania.

Arlington also argues that it qualifies for the first exception to the forum rate rule because it should be afforded the opportunity to retain the most competent counsel available to try a case without having to incur a detriment at the fee petition stage.   The Court agrees with Arlington; it is entitled to retain whomever it wishes as counsel. However, in determining the reasonable rate at which Arlington's fees can be recovered from Bridgeport, the Third Circuit Court of Appeals was clear in *Interfaith* that the forum rate rule applies unless a party can demonstrate that one of the two narrow exceptions to the rule is satisfied.

Arlington further argues that it qualifies for the first exception to the forum rate rule because Ms. Clune has successfully represented Arlington for twelve years in patent infringement actions against Bridgeport and thus possesses institutional knowledge of the case that is invaluable and cannot be replaced.  While Ms. Clune's experience representing Arlington is impressive, and she has indeed achieved great success in doing so, the Third Circuit has yet to recognize an "intimate familiarity" or "institutional knowledge" exception to the forum rate rule for attorney's fees.  If experience and familiarity with a particular client or matter qualified as "special expertise"

17

under the first exception, every loyal lawyer who has performed significant services for the same client would satisfy it, and the first exception would swallow the forum rate rule.

In a further attempt to demonstrate that C&M attorneys qualify for an exception to the forum rate rule, Attorney Tribeck stated that "at the time this matter commenced, and indeed through the present, Rhoads & Sinon could not have served as primary lead counsel in this matter due to staffing requirements and experience." (*Tribeck Sec. Decl.*, Doc. 246-6, ¶ 16).  He further noted that "this proceeding required the knowledge of complex patent law related to contempt proceedings, as well as intimate familiarity with the underlying past litigation of the parties, the underlying settlement agreement, patent prosecution, history, and the parties' respective Enjoined and Accused Connectors." *Id*. at ¶ 20.  Tribeck testified similarly at the hearing.  Mr. Freedenberg also stated in a declaration that "had [he] been approached to represent Arlington at that time, after explaining to Arlington all the reasons why, absent extraordinary circumstances, a decision to discharge Crowell & Moring and engage new counsel for the contempt proceeding would have been imprudent, I would have declined, for all the same reasons cited by Mr. Tribeck." (*Freedenberg Sec. Decl.,* Doc. 246-25, ¶ 18.)   However, Arlington has not provided any evidence to suggests that prior to retaining Ms. Clune as lead counsel, Arlington performed any kind of inquiry or search into retaining an attorney from the Middle District of Pennsylvania, and more importantly, and in any event, Arlington did retain Mr. Tribeck, a patent attorney, as counsel in this case.[6]  Moreover, any historical knowledge required to present the case could have been secured by consultation, not lead representation.  Post-hoc declarations or testimony from Mr. Tribeck and Mr. Freedenberg that they would not have accepted this case as lead counsel are

---

[6]      Whether Mr. Tribeck was local counsel to satisfy Local Rule 83.9 is of no moment.  He is a patent attorney; he did perform as counsel in the case, by actively participating in the presentation of Arlington's case at the Contempt Hearing.

insufficient to demonstrate that this case requires special expertise from a distant district.[7]

Therefore, there relevant community for determining C&M and Rhoads's attorney's fees is the Middle District of Pennsylvania.  Looking to prevailing rates in the Middle District of Pennsylvania, Arlington and Bridgeport submitted conflicting declarations as to what constitutes a reasonable rate.  *See* Declaration of Bruce J. Phillips (Doc. 258), Declaration of Harvey Freedenberg (Doc. 222-23), Declaration of Walter T. Grabowski (Doc. 255), Declaration of Erin A. Brennan (Doc. 235).  Because, as noted above, there is conflicting evidence as to the prevailing rates in the Middle District of Pennsylvania, the Court will affix an adjusted rate.  See *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001).  I hasten to add this is not about who Arlington can retain as counsel, but rather what the apposing party is required to pay that retained counsel.

> ### a.     Attorney Clune's Rate

Kathryn Clune serves as the vice-chair of C&M's Intellectual Property Group and is a member of the firm's Litigation and Trial Department.  (*Clune Decl.*, Doc. 222-2 , ¶ 21 (a).)  She has represented Arlington in patent litigation matters since 2001 and has

---

[7]     Arlington did not argue that it qualifies for the second exception to the forum rate rule, that local counsel were unwilling to handle the case. However, even if Arlington did attempt to use this testimony to satisfy this exception, it still falls short of the kind of testimony that persuaded the Third Circuit in *Interfaith* that the second exception was met: an affidavit from local counsel stating that "[a]t the time the suit was initiated, I was not aware of any attorneys or law firms who would have been willing to assume the risks of litigating cases of this type, particularly without contemporaneous payment for their services and expenses."  *Interfaith*, 426 F.3d at 707.  Statements made more than two years after the fact that they "would have declined" to serve as lead counsel for Arlington, based on staffing requirements and lack of experience, are not sufficiently persuasive.

been practicing as an attorney for over 20 years.  *Id.* at ¶¶ 3, 21(a).  Clune asserts that

she charged Arlington a discounted hourly rate of $600 in 2011 and 2012 and $700 in

2013.  *Id* at ¶ 27.

Bridgeport asserts that the prevailing rate for plaintiff's counsel in the Middle

District of Pennsylvania ranges between $220 and $300 an hour, relying on a

declaration from Wilkes-Barre attorney Bruce J. Phillips.  (Doc. 257, 19.)  Bridgeport also

objects to the significant increase in Clune's rates over the course of the fourteen

months of litigation.

In response, Arlington states that Philips and other experts relied on by Bridgeport

lack experience with patent litigation and therefore lack the ability to properly opine on

the reasonableness of hourly rates in this case.  (Doc. 246-2, 11.)  As to the prevailing

hourly rate in the Middle District of Pennsylvania, Arlington cites *Broadcast Music, Inc. v.

It's Amore Corp.*, 3:08-cv-570, 2009 WL 1886038 (M.D. Pa. June 30, 2009) for the

proposition that an hourly rate of $575 is in line with those prevailing in the community

for a copyright infringement case.  The Court is not persuaded that this is the case

because in *Broadcast Music* the opposing party did not challenge the fee calculation,

and the party seeking the fees represented that "an hourly rate of $575.00 is a

customary one for attorneys of his experience and expertise in Philadelphia, where he

practices."  *Id*. at *9.  Therefore, $575 per hour is not the appropriate rate to apply for

Ms. Clune in this case.

Instead, the Court finds that an hourly rate of **$450** is appropriate for an attorney

practicing patent law with Ms. Clune's level of experience and expertise in the Middle

District of Pennsylvania.  Even though we are applying the forum rate in this case and

Mr. Tribeck's rate represents the going rate for a patent lawyer in the Middle District, the

fact is that Ms. Clune has extensive experience which is greater than Mr. Tribeck's.

Thus, a rate in the Middle District higher than Mr. Tribeck's is justified.  As Arlington

notes, this rate appears to be reasonable when compared to the American Intellectual Property Law Association (AIPLA) Report of the Economic Survey (2013) (Doc. 222-26).

### b.    Attorney Zambrzycki's Rate

Jacob Zambrzycki is an associate at C&M's San Francisco office with four years of legal experience practicing patent law.  (*Clune Decl.*, Doc. 222-2 ¶ 21(b).)  Clune asserts that Zambrzycki's hourly rate was $380 in 2011, $400-430 in 2012, and $490 in 2013. *Id*. at  ¶ 28.  As noted above, Bridgeport asserts that the prevailing rate for plaintiff's counsel in the Middle District of Pennsylvania ranges between $220 and $300 an hour.  The Court finds that **$250** an hour, a rate that is within the range of rates charged by associates at Rhoads, is reasonable for Mr. Zambrzycki given his level of experience and area of expertise.

### c.    Attorney Katz's Rate

Amir Katz is an associate at C&M's Washington, D.C. office with three years of legal experience practicing patent and e-discovery law.  (*Clune Decl.*, Doc. 222-2 ¶ 21(c).)  Clune asserts that Katz's rate was $320 in 2011, $400 in 2012, and $455 in 2013.  *Id*. at ¶ 28.  The Court finds that a rate of **$220** an hour is reasonable for Mr. Katz given his area of expertise and slightly lower level of experience than Mr. Zambrzycki.

### d.    Rates of Other C&M Attorneys

Sonia Murphy was a member of C&M's Intellectual Property Group with ten years of legal experience focusing on patent litigation.  (*Clune Decl.*, Doc. 222-2 ¶ 22(a).)  She drafted Arlington's opposition to Bridgeport's Daubert Motion.  *Id.*  Clune asserts that

Murphy's rate was $595.  *Id*. at ¶ 28.  As counsel with less experience than Ms. Clune, the Court finds that an hourly rate of **$300** for Ms. Murphy is reasonable.

Jane Wessel is an attorney at C&M's London, England office, who assisted in finding a location for and entering into necessary contracts to take the deposition of Dr. Williamson, who resides in England.  (*Clune Decl.*, Doc. 222-2 ¶ 21(b).)  Clune asserts that Wessel's hourly rate was $400.  *Id*. at ¶ 28.  Because she was compensated at a similar rate to C&M associates, the Court finds that an hourly rate of **$230** is reasonable for her services.

Phillip Mancini was an associate at C&M from 2009-2013.  (*Clune Decl.*, Doc. 222-2 ¶ 21(c).)  While he was working on the case, he had close to seven years of patent litigation experience.  *Id.*  Clune asserts that his hourly rate was $560.  *Id*. at ¶ 28. Given his experience level, the Court finds that an hourly rate of **$280** is reasonable for Mr. Mancini.

Ali Hossein Khan Tehrani is currently a first year associate at C&M's Washington, D.C. office.  (*Clune Decl.*, Doc. 222-2 ¶ 21(d).)  Prior to Joining C&M, he worked in-house at Amazon.com's patent department.  *Id.*  Prior to September 2013, he worked on the matter as a student associate.  *Id.*  Clune asserts that Tehrani's hourly rate was $175 while he was a student associate and $360 after September 2013.  *Id*. at ¶ 28.  As a first year associate, the Court finds that an hourly rate of **$200** is reasonable for Mr. Tehrani, and an hourly rate of **$120**, in line with that of paralegal Ms. January, is reasonable prior to September 2013 given his level of experience with patents.

Vince Galluzo is an associate at C&M's Washington, D.C. office with three years of legal experience.  (*Clune Decl.*, Doc. 222-2 ¶ 21(e).)  Clune asserts that his rate was $320 in 2011 and $400 in 2012.  Like Mr. Katz, the Court finds that an hourly rate of **$220** is reasonable for Mr. Galluzo.

Preetha Chakrabarti is a first year associate at C&M's New York office.  She worked on discrete legal research issues related to the determination of sanctions. (*Clune Decl.*, Doc. 222-2 ¶ 21(f).)  Clune asserts that her rate was $365.  *Id*. at ¶ 28. Like Mr. Tehrani, the Court finds that an hourly rate of **$200** is reasonable for Ms. Chakrabarti.

Elliot Golding is an associate at C&M's Washington, D.C. office with four years of legal experience, practicing antitrust and health care law.  (*Clune Decl.*, Doc. 222-2 ¶ 21(g).)  Clune asserts that his hourly rate is $490.  *Id*. at ¶ 28.  The Court finds that an hourly rate of **$230** is reasonable given his experience and expertise.

### e.    C&M Paralegal Rates

Desiree January supported Ms. Clune, Mr. Katz, and Mr. Zambrzycki as a paralegal from December 2011 to October 2012.  (*Clune Decl.*, Doc. 222-2 ¶ 24.)  When she worked on this matter, she was a senior paralegal with 6 years of experience.  *Id.* Her hourly rate was $195 in 2011 and $215 in 2012.  *Id*. at ¶ 28.  In addition to Ms. January, April Stillwell served as a paralegal on this case from December 2012 to the present.  *Id.*  At the time, she was a senior paralegal with thirteen years of experience. *Id.*  Her hourly rate was $235.  *Id*. at ¶ 28.

Apart from Ms. January and Ms. Stillwell, Juan Geraldo, a project assistant with one year of experience, Virginia Li, a paralegal with six years of experience, and George Smith, a senior paralegal with 4.5 years of experience worked a small number of hours on the case.  (*Clune Decl.*, Doc. 222-2 ¶ 25.)  Geraldo's hourly rate was $145, Li's hourly rate was $195, and Smith's hourly rate was $165.  *Id*. at ¶ 28.

Bridgeport asserts that typical paralegal rates in the Middle District of Pennsylvania are between $70 and $120 an hour.  *See Overly v. Global Credit & Collection Corp., Inc.*, 1:10-cv-2392, 2011 WL 2651807, at *5 (M.D. Pa. July 6, 2011).

Since *Overly*, a rate of $150 an hour was approved for a paralegal in a FLSA case.  *See Dino v. Pennsylvania*, No. 1:08-cv-1493, 2013 WL 6504749, at * 3 (M.D. Pa. Dec. 11, 2013).  Similarly, Arlington's expert, Mr. Freedenberg, suggests that an hourly rate of $125-$225 is reasonable for paralegals in this district.

Given her six years of experience, and area of work, the Court finds that an hourly rate of **$120** is reasonable for Ms. January.  An hourly rate of **$130** an hour is reasonable for Ms. Stillwell, with seven more years of experience than Ms. January.  An hourly rate of **$75** is reasonable for the work of Mr. Geraldo, Ms. Li, and Mr. Smith.

### f.    Attorney Tribeck's Rate

Robert Tribeck is a partner in the Harrisburg office of Rhoads & Sinon, LLP and has been practicing for over nineteen years.  (*Tribeck Decl.*, Doc. 222-20 ¶ 6(a).)  Mr. Tribeck states that he charged Arlington a reduced hourly rate of $375 to $395 per hour.

Bridgeport asserts that Tribeck's rates are not reasonable compared with this forum's rates for similarly qualified individuals.  (Doc. 257, 20).  It relies on the declaration of Bruce J. Phillips (Doc. 258) for the proposition that $275 an hour would be a more reasonable and customary market rate for Mr. Tribeck.  Because none of the attorneys considered by Mr. Phillips in his analysis of the customary market rate in the Middle District of Pennsylvania have experience with patent litigation, the Court finds that an hourly rate of $275 an hour is too low in this case.  Given Mr. Tribeck's substantial experience and the complexities of litigating this contempt proceeding,[8] the Court finds that an hourly rate of **$375** is reasonable for Mr. Tribeck.  This rate reflects

---

[8]     At argument and in its brief, Bridgeport repeatedly attempts to deflate the complexity of this matter, labeling it as a "mere motion for contempt."  However, as the Court recalls, the proceeding was complex and did involve both an infringement and colorable imitation analysis.  *See* Doc. 192.

his lower level of experience and expertise in patent litigation compared to Ms. Clune.

### g.     Rates of Rhoads & Sinon Associates

Amanda Lavis, an associate at Rhoads and a member of the firm's Intellectual Property and Business Litigation groups, graduated from law school in 2010.  (*Tribeck Decl.*, Doc. 222-20 ¶ 6(b).)  Peri Fluger, also a member of the firm's Intellectual Property group, also graduated from law school in 2010.  *Id.* at ¶ 6(e)

Nicole Radziewicz, a member of the firm's Business Litigation practice group, graduated from law school in 2012.  *Id.* at ¶ 6(c).  John Martin, also an associate at Rhoads in an unspecified practice group, graduated from law school in 2006.  *Id.* at ¶ 6(d).  Casey Coyle, another associate at the firm in an unspecified practice group, graduated from law school in 2008.  *Id.* at ¶ 6(f).  Holly Cline, an associate in the firm's Business Litigation practice group graduated from law school in 2008.  *Id.* at ¶ 6(g).  Evan Jones joined the firm's Business Litigation practice group in 2013, and prior to that worked as a law clerk for the firm.

Tribeck asserts that the blended hourly rate for the associate attorneys at Rhoads is $275 to $295.

Bridgeport asserts that the increases in the associates rates upwards from $275 an hour are unreasonable (Doc. 58,¶ 11), and the Court agrees.  Bridgeport also asserts that the customary hourly rate for an associate in the Middle District of Pennsylvania is $170.  As noted above, because patent litigation is a specialized and complex field, the Court finds than an hourly rate of **$220** is reasonable in this case for Ms. Lavis and Mr.

Fluger, members of the firm's Intellectual Property group.  An hourly rate of **$175** is reasonable for all other Rhoads associates.[9]

### h.        Rates of Rhoads & Sinon Paralegals

Jodie Koons has sixteen years of experience "as a paralegal or the equivalent" and Kimberly Houser has thirty-two years as a paralegal or the equivalent.  (*Tribeck Decl.*, Doc. 222-20 ¶ 7(a-b).)

Mr. Tribeck asserts that the hourly rate of Ms. Koons was $165-$170 per hour and the hourly rate of Ms. Houser was $150 per hour.  The Court finds these rates to be unreasonable, and instead finds that an hourly rate of **$120** per hour to be appropriate given their years of experience.

### 3.        Attorney's Fees Conclusion

Based on the foregoing, the Court finds that Arlington is entitled to a total of **$1,429,244.23** in attorney's fees based on a reasonable number of hours spent and the prevailing rates for the work performed in the Middle District of Pennsylvania.

### D.        Costs and Expenses

Federal Rule of Civil Procedure 54(d)(1) provides, in pertinent part, that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  The determination of which costs will be awarded to the prevailing party is a matter left to the sound discretion of the district court.  *Bowers v. Foto-Wear, Inc.*, No. 3:CV-03-1137, 2007 WL 4086339, at *4 (M.D. Pa. Nov. 15, 2007) (citing *Farmer v. Arabian Am. Oil Co.*,

---

[9]        Mr. Tribeck specifies the year that each associate graduated from law school but not the number of years of legal experience each possesses. Therefore, the Court cannot meaningfully differentiate between them in terms of designating an appropriate hourly rate.

379 U.S. 227, 232, 85 S. Ct. 411, 13 L. Ed. 2d 248 (1964).  "Although that discretion is not unbounded it allows the district court a wide range within which its determination will not be upset by an appellate court."  *Copperweld Steel Co. v. Demag- Mannesmann-Bohler*, 624 F.2d 7, 8 (3d Cir.1980).  In addition, Rule 54(d)(2) allows claims for "related non-taxable expenses" which may include "costs for postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food."  *Bowers*, 2007 WL 4086339, at *5.

Arlington seeks reasonable costs in the amount of **$268,187.63** pursuant to 28 U.S.C. § 1920, as well as additional non-taxable expenses.  This amount is broken down into a total of $183,909.36 in consultant fees: $148,237.50 for Arlington's technical expert, Dr. Rahn, $11,878.40 for Duff & Phelps, LLC, which employs Arlington's damages expert, and $23,793.46 for Resonant Legal Media, LLC, a trial graphics firm that provided demonstratives.  (*Clune Decl.*, Doc. 222-3, ¶ 36(a).)  In addition, Arlington requests a total of $33,456.37 for travel expenses during the litigation.  *Id.* at ¶ 36(b).  Next, Arlington requests a total of $31,916.03 for legal research and court reporter fees paid by Arlington during the litigation. *Id.* at ¶ 36(c).  Finally, Arlington requests a total of $18,905.87 for non-taxable expenses including duplication of documents, telephone charges, and Federal Express and other postage charges.  *Id.* at  ¶ 36(d).  *See also Clune Decl.*, Doc. 222-3, Ex. F-I and *Tribeck Dec;*. Doc. 222-20, Ex. B.

Bridgeport contends that Arlington's request for costs must be rejected because Arlington has not provided sufficient information to establish the compensable nature of the requested costs.  *See Perri v. Respons. Intern. Hotel, Inc.*, No. 10-cv-4489, 2014 WL 201520, at *3 ("A party seeking reimbursement for costs 'must provide sufficient information' to establish the compensable nature of the requested costs.'")  While Arlington has not submitted invoices from vendors or third parties to substantiate its alleged costs, the Court finds that the records submitted are sufficiently detailed and that the above costs are reasonable. Therefore, the Court will grant the costs in total.

## CONCLUSION

As explained above, Arlington shall be awarded **$1,527,632.35** in attorney's fees and **$282,839.55** in costs and expenses.  Arlington will also be awarded **$495,648.79** in lost profits, plus **$33,918.61** in prejudgment interest to date.

An appropriate order follows.


_____                                    _____

Date                                                               A. Richard Caputo
                                                                      United States District Judge